IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**RONALD BROWN,**

    **Plaintiff,**

    **v.**

**OHIO HEALTH CORPORATION,**

    **Defendant.**

**Case No. 2:11-cv-914**

**Judge Peter C. Economus**

**Magistrate Judge Norah McCann King**

**MEMORANDUM OPINION AND ORDER**

Presently pending before the Court are the Defendant's motion for summary judgment (Doc. 29) and motion to strike (Doc. 41). For the reasons that follow, the Court **GRANTS** both motions.

**I.**

Plaintiff Ronald Brown brings the instant action against Defendant OhioHealth Corporation ("OhioHealth"), asserting claims for: (1) disability discrimination; (2) race discrimination; (3) religious discrimination; (4) retaliation; (5) negligent hiring, supervision, and retention; and (6) wrongful termination in violation of public policy. Brown's claims arise from his employment with OhioHealth, which ended in 2010 following a work-related injury. Upon completion of discovery, OhioHealth timely moved the Court for summary judgment and to strike an affidavit filed by Brown in response to the summary judgment motion. Briefing of the issues is now complete

**II.**

As a preliminary matter, OhioHealth asks the Court to strike an affidavit Brown filed in which he essentially avers that, during his deposition, medication made him confused and hindered his ability to testify. *See* Brown Aff. During his deposition, however, Brown testified

that he would indicate at any time if the muscle relaxer he was taking was affecting his ability to give accurate testimony. Brown Dep. 9. He also indicated that he was not taking other medications that would affect his ability to testify truthfully and that he was not suffering from any mental or physical condition that would affect his testimony. *Id.* During the remainder of his testimony, Brown never indicated that the medication was affecting his ability to testify.

It is well settled that a litigant generally cannot create a material issue of fact at summary judgment by filing an affidavit that is inconsistent with prior deposition testimony. *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986). As the Court finds that Brown's affidavit is inconsistent with his testimony that he would inform counsel for OhioHealth if medication interfered with his ability to testify, the Court grants OhioHealth's motion to strike and will not consider the affidavit in deciding the pending motion for summary judgment, which the Court turns to below.

### III.

### A.

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting prior version of FED. R. CIV. P. 56). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323–25. Once the movant meets this burden, the opposing party "must

set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation and citation omitted).

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

**B.**

The record produced during discovery and cited by the Parties indicates the following: Brown began his employment with OhioHealth in 1978. Brown Dep. 20. During his employment, he served in several positions for OhioHealth at Grant Hospital in Columbus, including in the dietary department, transporting patients, as a patient care assistant, and as a post-anesthesia care assistant. *Id.* 24–27.

In July 2005, he transferred from Grant Hospital to OhioHealth's HomeReach division and became an "HME Service Tech." *Id.* 27. The job description for the position describes the various duties as follows: "Functions as a front-line customer service representative to patients and care givers. Delivers equipment/supplies to and from patients' homes, instructs patients and families in proper use of equipment, and provides set-up. Some HME Service Techs also do scheduling and dispatching." *Id.* Ex. 6. According to Brown, the job description accurately

3

reflected his duties at HomeReach, but he was also occasionally required to do work in the HomeReach warehouse that included cleaning equipment. *Id.* 36–37. Brown's rate of pay upon transferring to HomeReach was $14.17 per hour and he received several raises. *Id.* 32. During his time there, he was supervised by warehouse supervisor Gerald Smith. *Id.* 31. Ken Szymanski was the director of HomeReach's operations. *Id.*

On January 22, 2010, Brown was involved in an argument with a fellow HomeReach employee, Gary Brannon. Brown testified that, on that day, he returned to the warehouse with a load of dirty equipment. *Id.* 39. He was on call for further assignments and Brannon was his backup. *Id.* 39. A call was received to do an oxygen tank setup, and, because Brown had to unload the dirty equipment, he asked Brannon to handle the call, which needed to be addressed as soon as possible. *Id.* 39. At that point, Brannon accused Brown of frequently asking him to handle assignments, and started arguing with Brown. *Id.* 39–40. Brown called Smith, who asked to speak to Brannon. *Id.* 40–41. As Brannon spoke with Smith, Brown moved to the front office of the warehouse and waited. *Id.* 41. Eventually, Brannon came into the office, handed Brown the phone, and, according to Brown, "he got in my face, I mean, smack dab. And he said, you Muslim bastard, I'll kick your ass. And he threatened me." *Id.* 41. Brown does not allege that the argument involved physical violence and admitted to yelling and using some profanity during the argument. *Id.* 52–53. Following the argument, Brown went to work cleaning out his truck, while Brannon eventually left the warehouse to complete the oxygen tank setup. *Id.* 48.

The following Monday morning (the incident in question occurred on a Friday evening), Brown was informed by several co-employees that, after the argument, Brannon had called Brown, who is African-American, "a dumb nigger," although Brown conceded that he never personally heard Brannon use the epithet. *Id.* 43–45. That day, Brown also spoke to Smith

4

about the argument with Brannon and submitted a written statement detailing his version of what had happened. *Id.* 49–50.

Smith conducted an investigation into the incident, and, on February 5, 2010, Smith, Brown, Brannon, Szymanski, and Frederick Kwarteng, a representative from OhioHealth's human resources, participated in a meeting at which Branson and Brown received written warnings for the January 22nd argument. *See id.* 53–55. At the meeting, Brannon denied calling Brown "a Muslim bastard" but instead claimed to have called him "a Jerusalem raghead." *Id.* 56. According to Brown, at the time of the argument, although he had a shaved head and wore a beard, he is a Christian and has never been a practicing Muslim. *Id.* 56. Brannon also denied calling Brown a "dumb nigger." *Id.* 59. Notwithstanding OhioHealth's assertion that Brown threatened Brannon, Brown denied doing so. *Id.* 57. He further testified that, while Brannon had received warnings in the past, this was his first. *See id.* 57. Brown, however, later admitted to receiving a warning for an argument with another employee that had occurred in May 2002. *See id.* 63–65.

The February 5, 2010 written warnings required Brown and Brannon to attend anger management counseling within 90 days and put them both in a "zero tolerance" status. *See id.* 73–74. Brown did not attempt to internally appeal the written warning. *Id.* 73. He was never disciplined again during the remainder of his employment with OhioHealth. *Id.* 73. Further, Brown and Brannon were involved in no further incidents during that time. *Id.* 76.

Throughout his time at HomeReach, Brown had suffered several work-related injuries. He injured his back loading a hospital bed onto a truck in March 2006. *Id.* 79. In September 2009, he injured his neck and back while moving equipment. *Id.* 80. Brown suffered an additional back injury on March 12, 2010. *Id.* 100. On that day, he was carrying part of a bed on

5

his shoulder when his back "just gave out." *Id.* 100. He completed the setup of the bed, went to an emergency room, and later, as with his previous injuries, applied for and received workers' compensation benefits. *Id.* 101.

Following the March 12th injury, Brown was unable to return to work with OhioHealth because of his back injury and, per company policies, he was granted a leave of absence. *Id.* 102. On April 22, 2010, OhioHealth sent Brown a letter stating the following:

> This letter is to advise you that you are reaching the end of your six months/180 days leave of absence. According to the Leave of Absence policy (4.20) a leave may be granted for a period of up to 180 days, including approved Family Medical Leave time, within a rolling twelve month period. Therefore, your employment with OhioHealth will be terminated effective 07/25/2010. If you are receiving Temporary Disability Pay (TDP) it will end on 07/25/2010, and any remaining TAP will be paid.

*Id.* Ex. 21. That letter was followed by a subsequent letter from Szymanski dated June 25, 2010 informing Brown that because his Family Medical Leave time had expired, OhioHealth would seek to fill his position beginning on July 1, 2010. *See id.* Ex. 22. This letter also informed Brown that efforts would be made to place him in a new position prior to the expiration of his leave of absence. *See id.* Ex. 22.

Upon receiving the letter from Szymanski, Brown sent a letter to OhioHealth dated June 26, 2010 stating, "This letter is my notice that I am retiring from Ohio Health. My retirement is due to disability. The effective date of my retirement is July 24, 2010." *Id.* Vol. I, 117–18; Ex. 23. When asked during his deposition why he sent the letter indicating his intent to retire, Brown testified:

> Because I was still unable to return to work at the time. And by me getting the letter from OhioHealth that I would be terminated before—if I don't come back by this date, I said—thought about it. And with 32 years with the company—I hoped to have like five or six more years with them, but I felt like I was being forced out. So I had no other alternative but to do this letter for my retirement—to retire because I didn't want to be terminated.

6

> And after giving them good years of service, I felt—you know, I know they had to do what they had to do after so much time—you know, being off so long, but I sent in my letter that I'm gonna retire because I knew my back wasn't ready to come back to duty yet.

*Id.* Vol. I, 119–120.  Brown has never been released by his doctors to return to work because his neurologist believes he needs a fusion procedure in his back.  *Id.* Vol. I, 120.

## C.

### 1.

Brown brings claims pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Ohio antidiscrimination statute, Chapter 4112 of the Ohio Revised Code, and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, alleging that OhioHealth discriminated against him based on his disability or perceived disability.  Pursuant to the ADA, covered entities shall not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The Ohio antidiscrimination statute affords similar protection to disabled individuals, and Ohio courts have looked to federal regulations and case law in interpreting the Ohio statute.  *See* OHIO REV. CODE § 4112.02(A); *Bibee v. Gen. Revenue Corp.*, 991 N.E.2d 298, 301 (Ohio Ct. App. 2013).  The Rehabilitation Act also incorporates the ADA's standards for determining disability discrimination.  *See* 29 U.S.C. § 794(d).

Under the familiar *McDonnell Douglas* burden-shifting paradigm, an aggrieved employee attempting to prove disability discrimination based on circumstantial evidence must first establish a prima facie case of discrimination.  *See Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012).  A plaintiff may establish a prima facie case of disability discrimination by showing that: "(1) he is disabled; (2) he is otherwise qualified for the

7

position with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) his employer knew or had reason to know of his disability; and (5) his position remained open." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 449 (6th Cir. 1999).

OhioHealth concedes for purposes of its summary judgment motion that Brown is a disabled person as that term is defined by the ADA. Defs.' Mem. Supp. Mot. Summ. J. 7 n.6. However, even construing the record in Brown's favor, he has failed to offer evidence establishing that he was qualified for his position. In this regard, Brown testified during his deposition that, at the time he sent his resignation letter to OhioHealth, he was unable to return to work and that he has not been cleared by his doctors to work since his employment ended. *See* Brown Dep. Vol. I, 119–120; *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) ("because [plaintiff] was not released by her doctor to return to work, she has not met the second requirement that she be qualified to perform the essential functions of the job."). Further there is no evidence that Brown requested or proposed an accommodation that would allow him to return to his job. *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007) (initial burden is on employee to propose an accommodation and establish that accommodation is reasonable). Nor is there evidence that he requested or applied for but was denied other positions at OhioHealth.

As Brown has failed to offer evidence from which a reasonable jury could find in his favor on his claims for disability discrimination, the Court grants summary judgment to OhioHealth as to those claims.

**2.**

The Court similarly finds that Brown has failed to produce sufficient evidence for a reasonable jury to conclude that OhioHealth discriminated against him on the basis of his race or

religion, and accordingly awards summary judgment to OhioHealth as to those claims.

As with his disability discrimination claims, Brown's claims for religious and race-based discrimination are brought pursuant to both state (Section 4112.02(a) of the Ohio Revised Code and federal law (Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*). Title VII and the Ohio antidiscrimination statute both prohibit covered employers from discriminating against their employees on the basis of race and/or religion. *See* 42 U.S.C. § 2000e-2(a); OHIO REV. CODE § 4112.02(A). Federal cases interpreting Title VII are also used by Ohio courts in interpreting Ohio's analogous statutory protections. *See Ohio Civil Rights Comm'n v. David Richard Ingram, D.C., Inc.*, 630 N.E.2d 669, 672 (Ohio 1994) (citations omitted).

A plaintiff may establish a prima facie case of Title VII discrimination by "demonstrating (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that a similarly-situated employee outside the protected class or classes was treated more favorably than he." *Dodd v. Donahoe*, 715 F.3d 151, 156 (6th Cir. 2013) (quotation omitted). Title VII also protects employees from being subjected to workplace harassment based on protected characteristics where such harassment renders the workplace hostile to the employee. To make out a claim for a hostile work environment, a plaintiff must show: (1) membership in a protected class; (2) unwelcome harassment arising from membership in the protected class; (3) the harassment created a hostile work environment; and (4) employer liability. *Ladd v. Grand Trunk Western R.R., Inc.*, 552 F.3d 495, 500 (6th Cir. 2009). An isolated incident of harassment does not give rise to a hostile work environment. *See id.* 500–502.

The Court concludes that Brown has failed to produce sufficient evidence from which a reasonable jury could find OhioHealth liable for subjecting him to disparate treatment or a

hostile work environment based on either race or religion. Construing the evidence in Brown's favor, the Court must assume that Brannon referred to Brown as Muslim and a raghead during their argument on January 22, 2010 and told other employees that Brown was a dumb nigger. However, even aside from the fact that Brown is a Christian and not a Muslim, this is the only incidence of trouble with Brannon and the only incident related to race and/or religion that Brown has cited that occurred during the entirety of his employment at OhioHealth. As previously stated, a singular instance of harassment cannot form the basis for a claim of a hostile work environment. Thus, to the extent Brown advances a racial/religious harassment theory, his claim for discrimination based on those characteristics fails.

Similarly, there nothing in the record to give rise to the inference that OhioHealth took any action against Brown or treated him differently than similarly-situated employees on the basis of his race or religion. To the contrary, the record indicates that Brown's employment with OhioHealth ended because he was admittedly unable to return to work following the March 2010 injury to his back. While Brannon's use of a racial epithet is reprehensible, he was not Brown's supervisor or an OhioHealth manager. Further, even assuming that the written warning issued to Brown in the aftermath of the argument could be considered an adverse employment action, Brannon and Brown were treated exactly the same by OhioHealth management. Finally, while Brown cites testimony of co-worker Barry Stewart who opined that he felt Brown was subjected to discrimination based on a higher workload than other employees, see Stewart Dep. 66, there is nothing to suggest that this "workload discrimination" was based on race or religion even if it could be considered an adverse employment action. It is worth noting that Stewart also testified that management considered Brown to be the "golden boy" of the HomeReach division. *Id.* 66–67.

**3.**

The Court next considers Brown's claim of retaliation.  To establish a prima facie claim of retaliation, Brown "must show that (1) he engaged in protected activity, (2) the activity was known to the defendant, (3) [he] was subjected to materially adverse action, and (4) there was a causal connection between the protected activity and the adverse action."  *Harris v. Metro. Gov't of Nashville and Davidson Cnty., Tenn.*, 594 F.3d 476, 485 (6th Cir. 2010).

As articulated in the Complaint, Brown's theory of recovery for retaliation is predicated on his assertion that OhioHealth retaliated against him for filing charges with the Equal Employment Opportunity Commission and the Ohio Civil Rights Commission.  Compl. ¶¶ 55–56.  However, as noted by OhioHealth, Brown filed these complaints in August 2010, *after* his employment with OhioHealth had already ended, see Brown Dep. 150; Ex. 1, and after any action taken against him by OhioHealth evidenced by the record before the Court.  As such, his theory of retaliation expressed in the Complaint must fail, as OhioHealth could not have retaliated against him for protected activity he had not yet taken.  In other words, Brown cannot establish the requisite causal connection between his protected activity and any purported adverse action OhioHealth may have taken against him.

In his brief in opposition, Brown puts forth a theory of his retaliation claim distinct from that found in the Complaint, alleging that OhioHealth retaliated against him by giving him the written warning and denying him medical benefits in response to his complaints about Brannon following the argument.  As an initial matter, Brown has cited nothing in the record tending to show that the denial of medical benefits occurred.  In fact, he testified that he could not remember any instances in which OhioHealth denied him medical benefits.  *Id.* 125.  As such, any retaliation theory predicated on denial of medical benefits must fail.

On a more fundamental level, however, a plaintiff is not permitted "to expand [his or her] claims to assert new theories" in response to a defendant's motion for summary judgment without formally moving the court for leave to amend pursuant to Rule 15. *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007). *See Tucker v. Union of Needletrades, Indus., and Textile Emps.*, 407 F.3d 784, 787–89 (6th Cir. 2005). In the Court's view, considering the alternate theory of retaliation presented by Brown in his response is improper given the absence of a formal motion for leave to amend. Brown has failed to file such a motion despite the fact that discovery has long since been completed, and the motion for summary judgment has been pending for several months.

Finally, even if the Court were to consider the alternate retaliation theory, it would still deem an award of summary judgment to OhioHealth appropriate. In this regard, if a plaintiff is able to establish a prima facie case of retaliation, the burden then shifts to the defendant to articulate a legitimate, nonretaliatory reason for the action taken against the employee. *Harris*, 594 F.3d at 485. If the defendant is able to do so, the burden shifts back to the plaintiff to prove that the proffered reason is merely a pretext for the retaliation, which may be accomplished by showing that "the proffered reasons (1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) were insufficient to motivate the employer's action." *Id.* at 485–86. Here, OhioHealth has shown a nonretaliatory reason for Brown being issued the written warning—Brown's admitted participation in the argument, including yelling and the use of profanity. Brown Dep. 52–53. Brown, on the other hand, has offered no evidence tending to establish pretext.

As Brown has failed to offer evidence from which a reasonable jury could find in his favor as to his claims for retaliation, the Court grants summary judgment to OhioHealth as to

those claims.

**4.**

The Court also concludes that Brown has failed to produce sufficient evidence to create a material issue of fact as to his claim for negligent hiring, retention, and supervision of Gary Brannon. To succeed on this claim, Brown must be able to prove "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries." *Steppe v. Kmart Stores*, 737 N.E.2d 58, 66 (Ohio Ct. App. 1999) (quotation omitted).

Here, aside from the conclusory statements in his brief that his injuries suffered as a result of the argument with Brannon include harm to his reputation at work and being offended, Brown has cited nothing in the record to support a finding by a reasonable jury that he was injured by Brannon. Additionally, despite Brown's representation in his brief that the written warning issued following his argument with Brannon was the only discipline he had ever received during his employment with OhioHealth, during his deposition, he admitted to being issued a warning following a heated argument with another employee a few years prior to his argument with Brannon. *See* Brown Dep. 63–65. At the summary judgment stage of litigation, it is the obligation of the plaintiff to cite actual evidence supporting the allegations of his or her complaint. Here, as Brown has not offered evidence that would prove injury—an essential element of his claim for negligent hiring, retention, and supervision—the Court grants summary judgment to OhioHealth as to that claim.

**5.**

The Court likewise grants summary judgment to OhioHealth as to Brown's claim for wrongful termination in violation of public policy. The elements of such a claim are:

> (1) a clear public policy exists in a statute, regulation, or common law, (2) discharging employees under circumstances like those involved in the present case would jeopardize the policy, (3) the discharge at issue was motivated by conduct related to the policy, and (4) there was no overriding business justification for the discharge.

*Covucci v. Serv. Merch. Co., Inc.*, 115 F. App'x 797, 800 (6th Cir. 2004) (citing *Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308, 321 (Ohio 1997)). In his brief in response to OhioHealth's motion for summary judgment, Brown fails to cite any facts in support of his claim or to identify a public policy his purported termination was in violation of, but merely restates the allegations of his other failed claims. As such, Brown has not met his burden in responding to OhioHealth's motion for summary judgment.

**IV.**

For the above-stated reasons, the Defendant's motion for summary judgment (Doc. 29) and motion to strike (Doc. 41) are **GRANTED**. The Clerk is directed to enter judgment in favor of the Defendant and close this matter.

**IT IS SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE